Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

[additional counsel on signature page]

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGUES GERVAT, derivatively on behalf of VMWARE, INC., | |
| Plaintiff, | Case No.: 5:20-cv-3661 |
| v. | |
| PATRICK P. GELSINGER, ZANE ROWE, ANTHONY BATES, MARIANNE BROWN, MICHAEL BROWN, DONALD CARTY, MICHAEL DELL, EGON DURBAN, KAREN DYKSTRA, and PAUL SAGAN, | |
| Defendants, | **DEMAND FOR JURY TRIAL** |
| and | |
| VMWARE, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## INTRODUCTION

Plaintiff Hugues Gervat ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant VMware, Inc. ("VMware" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Patrick P. Gelsinger, Zane Rowe, Anthony Bates, Marianne Brown, Michael Brown, Donald Carty, Michael Dell, Egon Durban, Karen Dykstra, and Paul Sagan (collectively, the "Individual Defendants," and together with VMware, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of VMware, unjust enrichment, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding VMware, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by VMware's directors, officers, and controlling shareholder from March 30, 2019 through the present (the "Relevant Period").

2.      VMware is a software company based in Palo Alto, California. The Company offers a portfolio of software designed to assist customers in managing information technology ("IT") resources across digital workspaces.

3.      One of the financial metrics the Company regularly reports is its backlog, which the Company purports is comprised of "unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period."

4.      Between March 2019 and December 2019, the Company reported hundreds of millions of dollars in backlog, and in each of the Company's annual and periodic reports issued during that period, the Individual Defendants affirmed the accuracy of the Company's reported financial results, and certified that the Company maintained effective internal controls over its financial reporting.

5.      On February 27, 2020, after the market had closed, the Individual Defendants revealed to the public that the Enforcement Division of the SEC had commenced an investigation into the Company's reported backlog, and had requested information and documents from the Company concerning its backlog, as well as related accounting and disclosures.

6.      On this news, the price of the Company's stock plummeted by over 11%, falling from $135.63 per share at the close of trading on February 27, 2020, to $120.52 per share at the close of trading on February 28, 2020.

7.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or allowed certain of the Individual Defendants to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company's reported backlog failed to comply with required accounting and disclosure practices; (2) as a result, the Company would predictably be subjected to greater scrutiny from the SEC, culminating in an investigation into the Company's backlog and associated practices; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

8.      The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

9.      The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

10.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while two of them engaged in lucrative insider sales, netting proceeds of over $24.4 million. Approximately 7.66 million shares of the Company's common stock were repurchased during the Relevant Period for over $1.33 billion. As the Company's stock was actually only worth $120.52 per share during that time, the price at closing on February 28, 2020, the Company overpaid by over $410 million in total.

11.     In light of the Individual Defendants' misconduct, which has subjected VMware, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

12.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in the Securities Class Action, their being beholden to Defendant Michael Dell ("Dell"), whose total voting power is 97.4% as a result of his beneficial stock ownership, rendering him a controlling shareholder, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of VMware's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

14.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

19.     Venue is proper in this District because VMware and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiff**

20.     Plaintiff is a current shareholder of VMware common stock. Plaintiff has continuously held VMware common stock at the time of the alleged wrongdoing.

**Nominal Defendant VMware**

21.     VMware is a Delaware corporation with its principal executive offices at 3401 Hillview Avenue, Palo Alto, California 94304. VMware's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "VMW." The Company's common stock is divided into publicly traded Class A stock, which entitles holders to one vote per share, and non-public Class B stock, which entitles holders to ten votes per share.

**Defendant Gelsinger**

22.     Defendant Patrick Gelsinger ("Gelsinger") has served as the Company's CEO since September 2012. He also serves as a member of the Company's Mergers and Acquisitions Committee. According to the Company's Schedule 14A filed with the SEC on May 28, 2020 (the "2020 Proxy Statement"), as of May 18, 2020, Defendant Gelsinger beneficially owned 601,640 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A stock at the close of trading on May 18, 2020 was $139.03, Defendant Gelsinger owned approximately $83.6 million worth of VMware stock.

23.     For the fiscal year ended January 31, 2020, Defendant Gelsinger received $42,549,725 in compensation from the Company. This included $1,000,000 in salary, $40,010,184 in stock awards, $1,511,875 in non-equity incentive plan compensation, and $27,666 in all other compensation.

24.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Gelsinger made the following sales of the Company's Class A common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 5/1/2019 | 20,000 | $203.86 | $4,077,200 |
| 7/19/2019 | 20,000 | $180.00 | $3,600,000 |

Thus, in total, before the fraud was exposed, he sold 40,000 Company shares on inside information, for which he received approximately $7,677,200. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

25.     The Company's 2020 Proxy Statement stated the following about Defendant Gelsinger:

Mr. Gelsinger, age 59, has served as CEO and a director of VMware since September 2012. Prior to joining VMware, he served as President and COO, EMC Information Infrastructure Products at EMC from September 2009 to August 2012. Mr. Gelsinger joined EMC from Intel Corporation, where he was Senior Vice President and Co-General Manager of Intel Corporation's Digital Enterprise Group from 2005 to September 2009 and served as Intel's Senior Vice President, Chief Technology Officer from 2002 to 2005. Prior to this, Mr. Gelsinger led Intel's Desktop Products Group.

**Defendant Rowe**

26.     Defendant Zane Rowe ("Rowe") has served as the Company's CFO and Executive Vice President since March 2016. According to the 2020 Proxy Statement, as of May 18, 2020, Defendant Rowe beneficially owned 64,312 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A stock at the close of trading on May 18, 2020 was $139.03, Defendant Rowe owned approximately $8.94 million worth of VMware stock.

27.     For the fiscal year ended January 31, 2020, Defendant Rowe received $19,460,335 in compensation from the Company. This included $750,000 in salary, $17,780,998 in stock awards, $680,625 in non-equity incentive plan compensation, and $248,712 in all other compensation.

28.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Rowe made the following sales of the Company's Class A common stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| 4/2/2019 | 48,630 | $183.48 | $8,922,732 |
| 6/13/2019 | 22,579 | $175.70 | $3,967,130 |
| 9/5/2019 | 20,000 | $148.04 | $2,960,800 |
| 12/6/2019 | 6,509 | $148.63 | $967,432 |

Thus, in total, before the fraud was exposed, he sold 97,718 Company shares on inside information, for which he received approximately $16,818,094. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

Verified Shareholder Derivative Complaint

29.     The Company's annual report on Form 10-K for the fiscal year ended January 31, 2020 (the "2020 10-K") stated the following about Defendant Rowe:

> Zane Rowe has served as VMware's Chief Financial Officer and Executive Vice President since March 2016. Prior to joining VMware, he was EMC's Executive Vice President and Chief Financial Officer from October 2014 until February 2016. Prior to joining EMC, Mr. Rowe was Vice President of North American Sales of Apple Inc., a technology company that designs, develops, and sells consumer electronics, computer software, online services, and personal computers, from May 2012 until May 2014. He was Executive Vice President and Chief Financial Officer of United Continental Holdings, Inc., an airline holdings company, from October 2010 until April 2012 and was Executive Vice President and Chief Financial Officer of Continental Airlines from August 2008 to September 2010. Mr. Rowe joined Continental Airlines in 1993. Mr. Rowe currently serves on the board of Sabre Corporation.

**Defendant Bates**

30.     Defendant Anthony Bates ("Bates") has served as a Company director since February 2016. He also serves as the Chair of the Mergers and Acquisitions Committee, and as a member of the Compensation and Corporate Governance Committee. According to the 2020 Proxy Statement, as of May 18, 2020, Defendant Bates beneficially owned 12,540 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A stock at the close of trading on May 18, 2020 was $139.03, Defendant Bates owned approximately $1.74 million worth of VMware stock.

31.     For the fiscal year ended January 31, 2020, Defendant Bates received $352,606 in compensation from the Company. This included $123,640 in fees earned or paid in cash and $228,966 in restricted stock unit awards.

32.     The Company's 2020 Proxy Statement stated the following about Defendant Bates:

> Mr. Bates, age 53, has served as a director of VMware since February 2016. Mr. Bates has served as Chief Executive Officer ("**CEO**") of Genesys Telecommunications Laboratories, Inc., a customer experience software platform provider, since May 2019. Mr. Bates served as a board partner at Social Capital, an investment firm, from August 2018 until May 2019 and was CEO, Growth Equity at Social Capital from June 2017 until August 2018. From June 2014 until December 2016, Mr. Bates served as President of GoPro, Inc., a maker of video and photo capture devices. From June 2013 until March 2014, Mr. Bates was Executive Vice President, Business Development and Evangelism of Microsoft Corporation, a software company. Mr. Bates was CEO of Skype Inc., from October 2010 until its acquisition by Microsoft in 2011, subsequent to which Mr. Bates served as President of Microsoft's Skype Division until June 2013. From 1996 to October 2010, Mr. Bates served in various roles at Cisco Systems, Inc., most recently as Senior

Vice President and General Manager of Enterprise, Commercial and Small Business. Mr. Bates currently serves on the board of directors of eBay Inc.

**Defendant Marianne Brown**

33.     Defendant Marianne Brown has served as a Company director since October 2019. She also serves as a member of the Compensation and Corporate Governance Committee and the Related Persons Transactions Committee.

34.     For the fiscal year ended January 31, 2020, Defendant Marianne Brown received $210,284 in compensation from the Company. This included $34,121 in fees earned or paid in cash and $176,163 in restricted stock unit awards.

35.     The Company's 2020 Proxy Statement stated the following about Defendant Marianne Brown:

> Ms. Brown, age 61, has served as a director of VMware since October 2019. Ms. Brown served as Corporate Executive Vice President and Co-Chief Operating Officer ("**COO**"), Global Financial Solutions segment of Fidelity National Information Services, Inc. (FIS), a financial software, services and global business solutions provider from January 2018 through December 2019. Ms. Brown served as COO, Institutional and Wholesale Business of FIS since December 2015, when FIS acquired SunGard Financial Systems LLC, a software and IT services provider, at which she had served as COO from February 2014. From 2006 to 2014, Ms. Brown served as President and CEO of Omgeo, a global financial services technology company, and from 2005 to 2006 she was CEO of the Securities Industry Automation Corporation ("**SIAC**"), a subsidiary of the New York Stock Exchange that provides computers and communications systems to the New York and American stock exchanges. Prior to joining SIAC, Ms. Brown spent 26 years with Automatic Data Processing, Inc. ("**ADP**"), a provider of human capital management solutions to employers, in various positions of increasing responsibility in areas including customer service, account management and sales, operations, technology and development. Ms. Brown is also a director of Akamai Technologies, Inc. ("**Akamai**") and Northrop Grumman Corporation.

**Defendant Michael Brown**

36.     Defendant Michael Brown has served as a Company director since April 2007. He also serves as the Chair of the Audit Committee, and as a member of the Compensation and Corporate Governance Committee and the Related Persons Transactions Committee. According to the 2020 Proxy Statement, as of May 18, 2020, Defendant Michael Brown beneficially owned 18,542 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A stock at

the close of trading on May 18, 2020 was $139.03, Defendant Michael Brown owned approximately $2.57 million worth of VMware stock.

37.     For the fiscal year ended January 31, 2020, Defendant Michael Brown received $602,675 in compensation from the Company. This included $373,710 in fees earned or paid in cash and $228,966 in restricted stock unit awards.

38.     The Company's 2020 Proxy Statement stated the following about Defendant Michael Brown:

> Mr. Brown brings to our Board substantial financial expertise that includes extensive knowledge of the complex financial and operational issues facing large companies, and a deep understanding of accounting principles and financial reporting rules and regulations. He acquired this knowledge in the course of serving as the CFO of a global technology company, working with a major international accounting and consulting firm for 18 years and serving as a member of the audit committees of other public company boards. Mr. Brown's experience at Microsoft and on the boards of other technology companies also provides insight into the information technology industry. His experience as an independent auditor provides our Board and the Audit Committee with significant insight into the preparation of financial statements and knowledge of audit procedures. Through his many senior management positions, including as Chair of the board of the Nasdaq Stock Market and as a governor of the NASD, Mr. Brown has demonstrated his leadership and business acumen.

**Defendant Carty**

39.     Defendant Donald Carty ("Carty") has served as a Company director since December 2015. He also serves as a member of the Audit Committee. According to the 2020 Proxy Statement, as of May 18, 2020, Defendant Carty beneficially owned 12,945 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A stock at the close of trading on May 18, 2020 was $139.03, Defendant Carty owned approximately $1.79 million worth of VMware stock.

40.     For the fiscal year ended January 31, 2020, Defendant Carty received $313,966 in compensation from the Company. This included $85,000 in fees earned or paid in cash and $228,966 in restricted stock unit awards.

41.     The Company's 2020 Proxy Statement stated the following about Defendant Carty:

> Mr. Carty, age 73, has served as a director of VMware since December 2015. Mr. Carty is currently a private investor. Mr. Carty served as a director of EMC Corporation, VMware's then-parent company, from January 2015 until the Dell Acquisition in

9

September 2016. Mr. Carty served as Chairman of Virgin America Inc. from February 2006 to December 2016, when Virgin was acquired by Alaska Air Group, Inc. He served as Vice Chairman and CFO of Dell, Inc. from January 2007 to June 2008, and as Chairman and CEO of AMR Corporation and American Airlines from May 1998 to April 2003. Mr. Carty is also a director of Hawaiian Holdings, Inc., the parent company of Hawaiian Airlines, Inc., where he serves on the audit committee, compensation committee, safety committee and executive committee, and is a director of Canadian National Railway Company, where he chairs the audit committee and serves on the environment, safety and security committee, the human resources and compensation committee, the strategic planning committee, and the pension and investment committee.

**Defendant Dell**

42. Defendant Dell has served as a Company director and as the Chairman of the Board since September 2016. He is also the founder, Chairman, and CEO of Dell, Inc. ("Dell"), VMware's parent company. According to the 2020 Proxy Statement, as of May 18, 2020, Defendant Dell beneficially owned 30,678,605 shares of the Company's Class A common stock, as well as 307,221,836 shares of the Company's Class B common stock, which represented 100% of the Company's outstanding Class B common stock as of that date. Defendant Dell's beneficial stock ownership as of May 18, 2020 provided him with a total voting power of 97.4%, making Defendant Dell a controlling shareholder, and making VMware a "controlled company" under the rules of the NYSE. Given that the price per share of the Company's Class A stock at the close of trading on May 18, 2020 was $139.03, Defendant Dell owned approximately $4.26 billion worth of VMware stock.

43. The Company's 2020 Proxy Statement stated the following about Defendant Dell:

Mr. Dell, age 55, has served as a director and Chairman of the Board ("**Chairman**") of VMware since Dell acquired EMC Corporation ("**EMC**"), VMware's then-parent company, in September 2016 (the "**Dell Acquisition**"). Mr. Dell serves as a director, Chairman and CEO of Dell, a provider of scalable IT systems. Mr. Dell has held the title of Chairman of Dell Inc. since he founded the company in 1984. Mr. Dell also served as CEO of Dell Inc. from 1984 until July 2004 and resumed that role in January 2007. In 1998, Mr. Dell formed MSD Capital, L.P. for the purpose of managing his and his family's investments, and, in 1999, he and his wife established the Michael & Susan Dell Foundation to provide philanthropic support to a variety of global causes. Mr. Dell also serves as a director and non-executive Chairman of the board of SecureWorks Corp. ("**SecureWorks**"), a majority-owned subsidiary of Dell.

**Defendant Durban**

44.     Defendant Egon Durban ("Durban") has served as a Company director since September 2016, and as a director of Dell, VMware's parent company, since October 2013. He also serves as a member of the Mergers and Acquisitions Committee.

45.     The Company's 2020 Proxy Statement stated the following about Defendant Durban:

> Mr. Durban, age 46, has served as a director of VMware since the Dell Acquisition in September 2016. Mr. Durban has been a director of Dell since October 2013. Mr. Durban has been Co-CEO of Silver Lake, a global private equity firm, since December 2019 and previously served as a Managing Partner and Managing Director of the firm. Mr. Durban joined Silver Lake in 1999 as a founding principal. Mr. Durban also serves on the board of directors of Motorola Solutions, Inc. and Twitter, Inc.

**Defendant Dykstra**

46.     Defendant Karen Dykstra ("Dykstra") has served as a Company director since March 2016. She also serves as the Chair of the Related Persons Transactions Committee, and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of May 18, 2020, Defendant Dykstra beneficially owned 11,461 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A stock at the close of trading on May 18, 2020 was $139.03, Defendant Dykstra owned approximately $1.59 million worth of VMware stock.

47.     For the fiscal year ended January 31, 2020, Defendant Dykstra received $637,353 in compensation from the Company. This included $408,387 in fees earned or paid in cash and $228,966 in restricted stock unit awards.

48.     The Company's 2020 Proxy Statement stated the following about Defendant Dykstra:

> Ms. Dykstra, age 61, has served as a director of VMware since March 2016. Ms. Dykstra served as CFO and Administrative Officer of AOL, Inc., a global media technology company, from November 2013 until July 2015, and as Executive Vice President and CFO of AOL from September 2012 until November 2013. Ms. Dykstra served on the board of directors of AOL from 2009 until September 2012, including service as Chair of the audit committee during her last two years on the AOL board. From January 2007 until December 2010, Ms. Dykstra was a Partner of Plainfield Asset Management LLC ("**Plainfield**"), and she served as COO and CFO of Plainfield Direct LLC, Plainfield's business development company, from May 2006 to 2010, and as a director from 2007 to 2010. She previously spent over 25 years with ADP, from 1981 through 2006, serving most recently as CFO from January 2003 to May 2006, and previously as Vice President - Finance, Corporate Controller and in other capacities. Ms. Dykstra is currently a

director of Gartner, Inc., where she serves on the audit committee, and is a director of Boston Properties, Inc., where she also serves on the audit committee.

**Defendant Sagan**

49.     Defendant Paul Sagan ("Sagan") has served as a Company director since April 2014, and has served as lead director since February 2015. He also serves as the Chair of the Compensation and Corporate Governance Committee, and as a member of the Audit Committee. According to the 2020 Proxy Statement, as of May 18, 2020, Defendant Sagan beneficially owned 16,415 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A stock at the close of trading on May 18, 2020 was $139.03, Defendant Sagan owned approximately $2.28 million worth of VMware stock.

50.     For the fiscal year ended January 31, 2020, Defendant Sagan received $672,675 in compensation from the Company. This included $443,710 in fees earned or paid in cash and $228,966 in restricted stock unit awards.

51.     The Company's 2020 Proxy Statement stated the following about Defendant Sagan:

Mr. Sagan, age 61, has served as a director of VMware since April 2014 and as VMware's Lead Director since February 2015. Mr. Sagan has been Managing Director at General Catalyst, a venture capital firm, since January 2018, and previously served there as an Executive In Residence (XIR) from January 2014. Mr. Sagan was a director of EMC from December 2007 until the Dell Acquisition in September 2016. From April 2005 to January 2013, Mr. Sagan served as CEO of Akamai, a provider of services for accelerating the delivery of content and applications over the Internet, and was President from May 1999 to September 2010 and from October 2011 to December 2012. Mr. Sagan joined Akamai in October 1998 as Vice President and COO. Mr. Sagan was a member of President Obama's National Security Telecommunications Advisory Committee from December 2010 until January 2017. From July 1997 to August 1998, Mr. Sagan was Senior Advisor to the World Economic Forum. Previously, Mr. Sagan held senior executive positions at global media and entertainment companies Time Warner Cable and Time Inc., affiliates of Time Warner, Inc., as well as at CBS, Inc. Mr. Sagan is also a director of Moderna, Inc.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

52.     By reason of their positions as officers, directors, controlling shareholder, and/or fiduciaries of VMware and because of their ability to control the business and corporate affairs of VMware, the Individual Defendants owed VMware and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and

manage VMware in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of VMware and its shareholders so as to benefit all shareholders equally.

53.     Each director, officer, and controlling shareholder of the Company owes to VMware and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling shareholder of VMware, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55.     To discharge their duties, the officers, directors, and controlling shareholder of VMware were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and controlling shareholder of VMware, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controlling shareholder of the Company has been ratified by the remaining Individual Defendants who collectively comprised VMware's Board at all relevant times.

57.     As senior executive officers, directors, and/or controlling shareholder of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of

inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

58.    To discharge their duties, the officers and directors of VMware were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of VMware were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to VMware's own Business Conduct Guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how VMware conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of VMware and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that VMware's operations would comply with all

applicable laws and VMware's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.     Each of the Individual Defendants further owed to VMware and the shareholders the duty of loyalty requiring that each favor VMware's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of VMware and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, directorial, and controlling positions with VMware, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by VMware.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

63.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to

conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of VMware was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of VMware and was at all times acting within the course and scope of such agency.

## VMWARE'S BUSINESS CONDUCT GUIDELINES

68.     VMware's Business Conduct Guidelines state that they "outline[s] the standards of behavior expected of each one of us at all times," and provide that the values set forth in the Business Conduct Guidelines apply "at every level in the company."

69.     In a section titled, "Act with Integrity," the Business Conduct Guidelines state the following:

> The expectations of VMware concerning the behavior of VMware people should reflect our corporate values and be similar to the personal expectations we, as VMware people, set for ourselves.

> Integrity is a core value at VMware. We are a market leader, and we never take our leadership for granted. We are as bold as we are humble, as competitive as we are fair, as decisive as we are respectful. We build and protect trusted relationships with our customers, partners, shareholders, and extended communities. We are expected to act with integrity at all times, which means

> - Be honest and ethical in all of our dealings
> - Comply with all laws and seek help in cases of uncertainty
> - Adhere to all VMware policies, guidelines, and rules
> - Be respectful of others
> - Be accountable, be responsible, and meet commitments
> - Do what is right

70.     In a section titled, "Obey the Law and VMware Policy," the Business Conduct Guidelines state the following, in relevant part:

> VMware is committed to conducting its business in accordance with all applicable laws, rules, and regulations, and we should conduct ourselves in the same manner. Compliance with the law is the minimum expectation. Personal integrity often will involve a standard higher than what exists under the law.

> * * *

> Our success at VMware is dependent upon the trusted relationships that we build with our customers, partners, and suppliers as well as among our coworkers and our extended communities. This level of trust builds over time and after demonstrating integrity in making the right choices and decisions. Ultimately, we should treat others as we would hope to be treated ourselves. In the workplace, if we compromise our integrity, our behavior impacts not only our individual and team reputations, but also the reputation of VMware.

> * * *

We must not buy or sell VMware securities or of the Tracking Stock* if we are aware of "inside" information, that is, material non public information about VMware. Similarly, if we become aware of inside information about other companies, such as VMware partners, suppliers, and customers, through our work at VMware, we must not buy or sell the securities of that company, nor should we pass along any inside information to others, such as friends or relatives. In addition, VMware people may not engage in any form of short-selling, hedging, puts, calls, or options trading in VMware stock or the Tracking Stock.

* * *

VMware people have a passion for our customers and products. Customer satisfaction is a paramount goal of VMware. To establish and maintain strong and long-lasting relationships, we must act with integrity and be honest and trustworthy in all of our dealings with customers, partners, vendors, and other third parties. Long-term relationships are more valuable than short-term gains. While involved in proposals, bids, or contract negotiations with third parties, we must communicate honestly. We also must only enter into agreements or commitments on behalf of VMware when we have the requisite authority. After a valid contract is entered into, both VMware and the customer or vendor must adhere to its terms. We only should enter into agreements on behalf of VMware that contain terms to that VMware can adhere. We should never take advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair dealing practice.

* * *

At VMware, we have a commitment to our shareholders to protect the company's assets and reputation. Our guidelines and processes have been created to ensure our statements and declarations to our shareholders are accurate and credible. Strict adherence to these policies and procedures is expected by VMware. By preserving our reputation, VMware may continue to create value for our customers and partners, thereby delivering superior results to its shareholders.

71.    In a subsection titled, "Maintain and Provide Accurate and Honest Business Records and Financial Reports," the Business Conduct Guidelines state the following:

The VMware books and records must reflect all transactions included in its results of operations and financial position truthfully, accurately, and in compliance with generally accepted accounting principles. VMware also has strict reporting obligations under certain statutes, including the U.S. Foreign Corrupt Practices Act of 1977, as amended, and securities laws. It is therefore essential that we report all business transactions honestly, accurately, and in compliance with all VMware policies and procedures. For example, all VMware people must provide truthful and accurate reports of expenses and time. Additionally, all VMware people in sales must provide truthful, accurate, and complete paperwork relating to sales transactions. Falsification of business documentation, whether or not it results in personal gain, is never permissible and might result in penalties to VMware and to the VMware person.

72.     In a subsection titled, "Ensure Full, Fair, Accurate, Timely, and Understandable Disclosure and Financial Reporting," the Business Conduct Guidelines state the following:

> As a public company, VMware is required to file periodic and other reports and documents with the U.S. Securities and Exchange Commission ("SEC") and to make other public communications. VMware must provide accurate, complete, and timely disclosure in those SEC reports and documents and in its other public communications, including disclosure of VMware financial results and financial condition. Accordingly, we must fully meet our responsibilities to ensure that VMware financial reports and records are in strict compliance with all applicable laws, generally accepted accounting principles, and VMware policies. We must provide information that is accurate, complete, objective, relevant, timely, and understandable; act in good faith, responsibly, with due care, competence, and diligence, without misrepresenting or omitting material facts or allowing our independent judgment to be subordinated; and impose and maintain appropriate controls over all assets and resources employed. VMware people must fully support the audit process and not take any action to improperly influence any public accountant performing an audit or review of VMware financial statements. These responsibilities apply to each of us, but are especially important if you are a member of the VMware Finance Department or are otherwise involved with VMware financial reporting.

73.     The Individual Defendants violated the Business Conduct Guidelines by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and failing to report the same. Moreover, two of the Individual Defendants violated the Business Conduct Guidelines by engaging in insider trading. Also in violation of the Business Conduct Guidelines, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

74.     Based in Palo Alto, California, VMware provides software products relating to cloud infrastructure and digital workspace technology. The Company's software spans cloud computing, networking and security, and other facets of the IT environment, and purportedly allows customers to streamline and enhance their business operations.

75.     In its annual and periodic reports filed with the SEC, the Company regularly reports a backlog of unfulfilled purchase orders, which mainly consists of "licenses, maintenance and services." The Company's 2020 10-K described VMware's backlog metric as follows, in relevant part:

> Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds.

* * *

> The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography. We do not believe that the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products or services.

**False and Misleading Statements**

***March 29, 2019 Form 10-K***

76.     During after-market hours on March 29, 2019, the Company filed its annual report on Form 10-K for the fiscal year ended February 1, 2019 with the SEC (the "2019 10-K"). The 2019 10-K was signed by Defendants Gelsinger, Rowe, Bates, Michael Brown, Carty, Dell, Durban, Dykstra, and Sagan, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Gelsinger and Rowe attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

77.     The 2019 10-K stated the following regarding the Company's backlog:

> Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds. As of February 1, 2019, our total backlog was $449 million. Backlog primarily consists of licenses, maintenance and services. Our backlog related to licenses was $147 million, which we generally expect to deliver and recognize as revenue during the following quarter. Backlog totaling $34 million as of February 1, 2019 is excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs. As of February 2, 2018, our total backlog was approximately $285 million and our backlog related to licenses was approximately $99 million.

The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography. We do not believe the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products and services.

78.    The 2019 10-K also stated the following regarding the Company's internal controls:

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) of the Exchange Act. Management has assessed the effectiveness of our internal control over financial reporting as of February 1, 2019 based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. As a result of this assessment, management concluded that, *as of February 1, 2019, our internal control over financial reporting was effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.*

\* \* \*

*There were no changes in our internal control over financial reporting during the most recent fiscal quarter ended February 1, 2019 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.*

\* \* \*

Management does not expect, however, that our disclosure controls and procedures or our internal control over financial reporting will prevent or detect all errors and fraud. Any control system, no matter how well designed and operated, is based upon certain assumptions and can provide only reasonable, not absolute, assurance that its objectives will be met. Further, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within the Company have been detected.

(Emphasis added.)

### *May 13, 2019 Proxy Statement*

79.    On May 13, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Gelsinger, Bates, Michael Brown, Carty, Dell, Durban, Dykstra, and Sagan solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff

80.     With respect to the Company's Business Conduct Guidelines, the 2019 Proxy Statement stated that the Board had adopted "Business Conduct Guidelines applicable to all directors, officers and employees. Our Board reviews the Corporate Governance Guidelines, the committee charters and the Business Conduct Guidelines periodically and implements changes as appropriate."

81.     The 2019 Proxy Statement called for shareholder approval of, among other things, an amendment to the Company's Amended and Restated 2007 Equity and Incentive Plan (the "2017 Incentive Plan"), which would authorize the Company to reserve an additional 13 million shares of Class A Company stock under the plan to be issued to the Company's officers and directors in connection with performance-based awards.

82.     The 2019 Proxy Statement also called for shareholder approval of an amendment to the Company's Amended and Restated 2007 Employee Stock Purchase Plan (the "2007 Stock Purchase Plan"), which would authorize the Company to reserve an additional 9 million shares of Class A Company stock to be purchased by Company employees pursuant to the 2007 Stock Purchase Plan.

83.     The 2019 Proxy Statement was false and misleading because the Business Conduct Guidelines were not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Business Conduct Guidelines.

84.     The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company's reported backlog failed to comply with required accounting and disclosure practices; (2) as a result, the Company would predictably be subjected to greater scrutiny from the SEC, culminating in an investigation into the Company's backlog and associated practices; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

85.     As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders approved the amendments to the 2007 Incentive Plan and the 2007 Stock Purchase Plan.

specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

*June 10, 2019 Form 10-Q*

86.     On June 10, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended May 3, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by the Company's Chief Accounting Officer, non-party Kevan Krysler ("Krysler"), and contained SOX certifications signed by Defendants Gelsinger and Rowe attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

87.     The 1Q19 10-Q stated the following regarding the Company's backlog:

Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds. As of May 3, 2019, our total backlog was $180 million. Backlog primarily consists of licenses, maintenance and services. Our backlog related to licenses was $48 million, which we generally expect to deliver and recognize as revenue during the following quarter. Backlog totaling $17 million as of May 3, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs. As of February 1, 2019, our total backlog was approximately $449 million and our backlog related to licenses was approximately $147 million. Backlog totaling $34 million as of February 1, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs.

The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography. We do not believe the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products and services.

88.     The 1Q19 10-Q also stated the following regarding the Company's internal controls:

We carried out an evaluation required by the Securities Exchange Act of 1934, amended (the "Exchange Act"), under the supervision and with the participation of our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of the end of the period covered by this report. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective*** to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, including our

principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

\* \* \*

During the first quarter of fiscal 2020, we completed the implementation of a new lease accounting software and related controls to enable us to adopt Topic 842, Leases.

***There were no other changes in our internal control over financial reporting during the most recent fiscal quarter ended May 3, 2019 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

### September 9, 2019 Form 10-Q

89.     On September 9, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended August 2, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by non-party Krysler and contained SOX certifications signed by Defendants Gelsinger and Rowe attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

90.     The 2Q19 10-Q stated the following regarding the Company's backlog:

Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds. As of August 2, 2019, our total backlog was $117 million. Backlog primarily consists of licenses, maintenance and services. Our backlog related to licenses was $13 million, which we generally expect to deliver and recognize as revenue during the following quarter. Backlog totaling $9 million as of August 2, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs. As of February 1, 2019, our total backlog was approximately $449 million and our backlog related to licenses was approximately $147 million. Backlog totaling $34 million as of February 1, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs.

The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography. We do not believe the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products and services.

91.     The 2Q19 10-Q also stated the following regarding the Company's internal controls:

We carried out an evaluation required by the Securities Exchange Act of 1934, amended (the "Exchange Act"), under the supervision and with the participation of our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of the end of the period covered by this report. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective*** to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures.

* * *

***There were no changes in our internal control over financial reporting during the most recent fiscal quarter ended August 2, 2019 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

### December 6, 2019 Form 10-Q

92.     On December 6, 2019, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended November 1, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by non-party Krysler and contained SOX certifications signed by Defendants Gelsinger and Rowe attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

93.     The 3Q19 10-Q stated the following regarding the Company's backlog:

Backlog is comprised of unfulfilled purchase orders or unfulfilled executed agreements at the end of a given period and is net of related estimated rebates and marketing development funds. As of November 1, 2019, our total backlog was $71 million. Backlog primarily consists of licenses, maintenance and services. Our backlog related to licenses was $33 million, which we generally expect to deliver and recognize as revenue during the following quarter. Backlog totaling $10 million as of November 1, 2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs. As of February 1, 2019, our total backlog was approximately $449 million and our backlog related to licenses was approximately $147 million. Backlog totaling $34 million as of February 1,

2019 was excluded from the remaining performance obligations because such contracts are subject to cancellation until fulfillment of the performance obligation occurs.

The amount and composition of backlog will fluctuate period to period, and backlog is managed based upon multiple considerations, including product and geography. We do not believe the amount of backlog is indicative of future sales or revenue or that the mix of backlog at the end of any given period correlates with actual sales performance of a particular geography or particular products and services.

94.    The 3Q19 10-Q also stated the following regarding the Company's internal controls:

We carried out an evaluation required by the Securities Exchange Act of 1934, amended (the "Exchange Act"), under the supervision and with the participation of our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) of the Exchange Act, as of the end of the period covered by this report. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective*** to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, including our principal executive officer and principal financial officer, as appropriate to allow timely decisions regarding required disclosures*.*

* * *

***There were no changes in our internal control over financial reporting during the most recent fiscal quarter ended November 1, 2019 that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

95.    The statements in ¶¶ 76–78 and 86–94 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company's reported backlog failed to comply with required accounting and disclosure practices; (2) as a result, the Company would predictably be subjected to greater scrutiny from the SEC, culminating in an investigation into the Company's backlog and associated practices; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

96.     After the market closed on February 27, 2020, the Company filed a current report on Form 8-K announcing the Company's year-end financial results. The Form 8-K revealed that the Company was being investigated by the SEC's Enforcement Division in connection with the Company's "backlog and associated accounting and disclosures," stating the following:

> In December 2019, the staff of the Enforcement Division of the Securities and Exchange Commission ("SEC") requested documents and information related to VMware's backlog and associated accounting and disclosures. VMware is fully cooperating with the SEC's investigation and is unable to predict the outcome of this matter at this time.

97.     On this news, the price of the Company's stock fell from $135.63 per share at the close of trading on February 27, 2020, to $120.52 per share at the close of trading on February 28, 2020, representing a loss in value of over 11%.

**Repurchases**

98.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $1.33 billion to repurchase approximately 7.66 million shares of its own common stock at artificially inflated prices.

99.     According to the 1Q19 10-Q, during the three-month period ended May 3, 2019, the Company purchased 3,264,000 shares of its common stock for approximately $591 million, at an average price of $180.96 per share.

100.     As the Company's stock was actually worth only $120.52 per share, the price at closing on February 28, 2020, the Company overpaid by over $197 million for repurchases of its own stock during the three-month period ended May 3, 2019.

101.     According to the 2Q19 10-Q, during the three-month period ended August 2, 2019, the Company purchased 2,431,000 shares of its common stock for approximately $446 million, at an average price of $183.53 per share.

102.     As the Company's stock was actually worth only $120.52 per share, the price at closing on February 28, 2020, the Company overpaid by over $153 million for repurchases of its own stock during the three-month period ended August 2, 2019.

103.     According to the 3Q19 10-Q, during the three-month period ended November 1, 2019, the Company purchased 1,638,000 shares of its common stock for approximately $242 million, at an average price of $147.65 per share.

104.     As the Company's stock was actually worth only $120.52 per share, the price at closing on February 28, 2020, the Company overpaid by over $44.5 million for repurchases of its own stock during the three-month period ended November 1, 2019.

105.     According to the 2020 10-K, between November 2, 2019 and November 29, 2019, the Company purchased 330,700 shares of its common stock for approximately $54.9 million, at an average price of $166.29 per share.

106.     As the Company's stock was actually worth only $120.52 per share, the price at closing on February 28, 2020, the Company overpaid by over $15.1 million for repurchases of its own stock between November 2, 2019 and November 29, 2019.

107.     Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $410 million.

## **DAMAGES TO VMWARE**

108.     As a direct and proximate result of the Individual Defendants' conduct, VMware has lost and expended, and will lose and expend, many millions of dollars.

109.     Such expenditures include, but are not limited to, expenses associated with the SEC's investigation into the Company, legal fees associated with the Securities Class Action filed against the Company and its CEO and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

110.     Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company,

including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

111.    Such losses include the Company's overpayment by over $410 million for repurchases of its own stock during the Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

112.    As a direct and proximate result of the Individual Defendants' conduct, VMware has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

113.    Plaintiff brings this action derivatively and for the benefit of VMware to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, officers, and/or controlling shareholder of VMware, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

114.    VMware is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

115.    Plaintiff is, and has continuously been at all relevant times, a shareholder of VMware. Plaintiff will adequately and fairly represent the interests of VMware in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

116.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

117.    A pre-suit demand on the Board of VMware is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Gelsinger, Bates, Marianne Brown, Michael Brown, Carty, Dell, Durban, Dykstra, and Sagan (the "Directors").

Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

118.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while one of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $410 million for repurchases of its own stock, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

119.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

120.    Additional reasons that demand on Defendant Gelsinger is futile follow. Defendant Gelsinger has served as the Company's CEO since September 2012, and also serves as a member of the Company's Mergers and Acquisitions Committee. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Gelsinger with his principal occupation, and he receives handsome compensation as described above, including $42,549,725 during the fiscal year ended January 31, 2020. Defendant Gelsinger was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, each of he personally signed off on. As the Company's highest officer and as a trusted director, Defendant Gelsinger conducted little, if any, oversight of the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider

sales, which yielded over $7.67 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Gelsinger is a defendant in the Securities Class Action. Thus, for these reasons, too, Defendant Gelsinger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121.    Additional reasons that demand on Defendant Bates is futile follow. Defendant Bates has served as a Company director since February 2016. He also serves as the Chair of the Mergers and Acquisitions Committee, and as a member of the Compensation and Corporate Governance Committee. Defendant Bates has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bates signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Bates breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122.    Additional reasons that demand on Defendant Marianne Brown is futile follow. Defendant Marianne Brown has served as a Company director since October 2019. She also serves as a member of the Compensation and Corporate Governance Committee and the Related Persons Transactions Committee. Defendant Marianne Brown has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Marianne Brown breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

123.    Additional reasons that demand on Defendant Michael Brown is futile follow. Defendant Michael Brown has served as a Company director since April 2007. He also serves as the Chair of the Audit Committee, and as a member of the Compensation and Corporate Governance Committee and the Related Persons Transactions Committee. Defendant Michael Brown has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Michael Brown signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Michael Brown breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

124.    Additional reasons that demand on Defendant Carty is futile follow. Defendant Carty has served as a Company director since December 2015. He also serves as a member of the Audit Committee. Defendant Carty has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Carty signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Carty breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.    Additional reasons that demand on Defendant Dell is futile follow. Defendant Dell has served as a Company director and as the Chairman of the Board since September 2016. He is also the founder, Chairman, and CEO of Dell, VMware's parent company. Defendant Dell's beneficial stock ownership as of May 18, 2020 provided him with total voting power of 97.4%, rendering him a controlling shareholder, and making VMware a "controlled company" under the rules of the NYSE. As

a trusted Company director and as the Company's controlling shareholder, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Dell signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Dell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.    Additional reasons that demand on Defendant Durban is futile follow. Defendant Durban has served as a Company director since September 2016, and as a director of Dell, VMware's parent company, since October 2013. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Durban signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Durban breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.    Additional reasons that demand on Defendant Dykstra is futile follow. Defendant Dykstra has served as a Company director since March 2016. She also serves as the Chair of the Related Persons Transactions Committee, and as a member of the Audit Committee. Defendant Dykstra has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Dykstra signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Dykstra breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Sagan is futile follow. Defendant Sagan has served as a Company director since April 2014, and has served as lead director since February 2015. He also serves as the Chair of the Compensation and Corporate Governance Committee, and as a member of the Audit Committee. Defendant Sagan has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sagan signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Sagan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on the Board is futile follow.

130.    Each of the Directors, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

131.    Additionally, as described above, Defendant Gelsinger directly engaged in insider trading, in violation of federal law and the Company's Business Conduct Guidelines. Defendant Gelsinger received proceeds of over $7.67 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to him, and excused

132.    Demand in this case is excused because the Directors, all of whom are named as defendants in this action, are beholden to and controlled by Defendant Dell, who controls the Company by virtue of his beneficial share ownership, which provided him with approximately 97.4% of total

shareholder voting power as of May 18, 2020. These shareholdings provide Defendant Dell with significant control over the continued employment of the Directors, especially Defendant Gelsinger, who is also the CEO of VMware. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Dell's control over them.

133.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Dell and Durban currently serve as CEO and Chairman, and as a director, respectively, of Dell, VMware's parent company. Defendant Carty, too, previously served as Vice Chairman and CFO of Dell between 2007 and 2008. Defendants Dell and Durban also previously served together on the boards of several other public companies, including SecureWorks Corp. and Pivotal Software, Inc. Additionally, Defendants Michael Brown, Carty, and Sagan each served as directors at EMC Corp. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

134.    Defendants Michael Brown, Carty, Dykstra, and Sagan (the "Audit Committee Defendants"), served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants were responsible for overseeing, *inter alia*, the integrity of the Company's financial statements, the Company's compliance with applicable laws and regulations, and the performance of the Company's internal audit function. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

135.    Additionally, Defendants Bates, Marianne Brown, Michael Brown, and Sagan (the "Compensation and Corporate Governance Committee Defendants"), served on the Company's Compensation and Corporate Governance Committee during the Relevant Period. Pursuant to the Company's Compensation and Corporate Governance Committee Charter, the Compensation and

Corporate Governance Committee Defendants were responsible for, *inter alia*, advising the Board with respect to matters of corporate governance, and recommending changes to the Company's corporate governance policies when appropriate. The Compensation and Corporate Governance Committee Defendants failed to fulfill their duties pursuant to the Compensation and Corporate Governance Committee Charter, allowing the Individual Defendants to make false and misleading statements and engage in other misconduct as described herein. Thus, the Compensation and Corporate Governance Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

136.    In violation of the Business Conduct Guidelines, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and waste of corporate assets. Moreover, in violation of the Business Conduct Guidelines, the Directors failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Directors face a substantial likelihood of liability and demand is futile as to them.

137.    VMware has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for VMware any part of the damages VMware suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

138.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment

about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

139.    The acts complained of herein constitute violations of fiduciary duties owed by VMware's officers, directors, and controlling shareholder, and these acts are incapable of ratification.

140.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of VMware. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of VMware, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

141.    If there is no directors' and officers' liability insurance, then the Directors will not cause VMware to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

142.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

143.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144.    The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

145.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

146.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

147.    Under the direction and watch of the Directors, the 2019 Proxy Statement failed to disclose, *inter alia*, that: (1) the Company's reported backlog failed to comply with required accounting and disclosure practices; (2) as a result, the Company would predictably be subjected to greater scrutiny from the SEC, culminating in an investigation into the Company's backlog and associated practices; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

Verified Shareholder Derivative Complaint

148.    The Individual Defendants also caused the 2019 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

149.    Moreover, the 2019 Proxy Statement was false and misleading when it discussed the Company's adherence to specific governance policies and procedures, including the Business Conduct Guidelines, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

150.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2019 Proxy Statement, including election of directors, advisory approval of executive compensation, appointment of an independent auditor, approval of an amendment to the 2007 Incentive Plan, and approval of an amendment to the 2007 Stock Purchase Plan.

151.    The false and misleading elements of the 2019 Proxy Statement led to the approval of the amendments to the 2007 Incentive Plan and the 2007 Stock Purchase Plan, and to the re-election of Defendants Carty and Sagan, which allowed them to continue breaching their fiduciary duties to VMware.

152.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

153.    Plaintiff on behalf of VMware has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of
Section 10(b) and Rule 10b-5 of the Exchange Act**

154.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding VMware. Not only is VMware now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon VMware by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices during the Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging VMware.

156.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

157.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about VMware not misleading.

158.    The Individual Defendants, as top executives, directors, and/or controlling shareholder of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors, officers, and/or controlling shareholder of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by VMware. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations

and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

159.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive, director, and/or controlling shareholder of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

160.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

161.    Plaintiff on behalf of VMware has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

162.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.    The Individual Defendants, by virtue of their positions with VMware and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of VMware and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause VMware and the other Individual Defendants to engage in the illegal conduct and practices complained of herein and violate § 10(b) of the Exchange Act.

164.    Plaintiff on behalf of VMware has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of VMware's business and affairs.

167.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

168.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of VMware.

169.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

170.    In further breach of their fiduciary duties owed to VMware, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company's reported backlog failed to comply with required accounting and disclosure practices; (2) as a result, the Company would predictably be subjected to greater scrutiny from the SEC, culminating in an investigation into the Company's backlog and associated practices; and (3) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

171.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

172.    The Individual Defendants also breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while two of them engaged in lucrative insider sales, netting proceeds of over $24.4 million.

173.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

174.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

175.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

176.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, VMware has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

177.    Plaintiff on behalf of VMware has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

178.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

179.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, VMware.

180.    The Individual Defendants either benefitted financially from the improper conduct and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from VMware that was tied to the performance or artificially inflated valuation of VMware, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

181.    Plaintiff, as a shareholder and a representative of VMware, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

182.    Plaintiff on behalf of VMware has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

183.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

184.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

185.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

186.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

187.    Plaintiff on behalf of VMware has no adequate remedy at law.

## PRAYER FOR RELIEF

188.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of VMware, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to VMware;

(c)    Determining and awarding to VMware the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing VMware and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect VMware and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of VMware to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with

applicable laws, rules, and regulations.

(e)     Awarding VMware restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 2, 2020                              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Hugues Gervat am a plaintiff in the within action. reviewed I have the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2020.

6/2/2020

Hugues Gervat

DocuSigned by:

2F6AF3BA1AB040E...

Hugues Gervat